## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |
|---|---|
| *In re McLean Data Breach Litigation* | Case No.: 3:25-cv-00461 <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiffs Jayaprakash Radhakrishnan, Micah Parks, and Priscilla Millberry ("Plaintiffs"), bring this Class Action Complaint ("Complaint") against Defendant McLean Mortgage Corporation ("McLean" or "Defendant"), as individuals and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions, and upon information and belief and their counsels' investigation as to all other matters, as follows:

### INTRODUCTION

1.      Plaintiffs seek monetary damages and injunctive and declaratory relief arising from Defendant's failure to safeguard the personal identifying information[1] ("PII") of consumers in its possession and care, which resulted in unauthorized access to its information systems on or around October 17, 2024, and the subsequent compromise and ***theft*** of that PII, causing widespread injury and damages to Plaintiffs and the proposed Class Members.

---

[1] The Federal Trade Commission ("FTC") defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, according to Defendant, not every type of information included in that definition was compromised in the subject data breach.

2.      Defendant McLean Mortgage Corporation is a Virginia-based financial institution which provides mortgages and other financing solutions to consumers.

3.      As explained in detail herein, on or around October 17, 2024, McLean detected unusual activity in computer systems indicating a data breach. Based on a subsequent forensic investigation, McLean determined that cybercriminals infiltrated its inadequately secured computer systems and accessed and stole files containing the sensitive personal information of 30,453 individuals (the "Data Breach").[2]

4.      As a result of the Data Breach Defendant failed to prevent, the PII of consumers in Defendant's possession, including Plaintiffs and the proposed Class Members, was stolen, including, but not limited to: their full names, Social Security numbers, driver's license numbers, and financial account numbers, passport numbers, and health insurance information (collectively "Private Information").[3]

5.      Defendant's investigation concluded that the Private Information compromised in the Data Breach included Plaintiffs' and other individuals' information (together, "Consumers").

6.      Unfortunately, the detrimental consequences of the Data Breach have already manifested in multiple instances of identity theft and fraud for Plaintiffs and Class Members.

7.      Defendant's failure to safeguard Consumers' highly sensitive Private Information as exposed and unauthorizedly disclosed in the Data Breach violates its common law duty, obligations under the FTC and other similar federal and state laws, and Defendant's implied contract with its customers and employees to safeguard consumers' Private Information.

---

[2] The "Notice of Data Breach." *Available at*:
https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/e423ab1f-c575-44f8-b5fc-c02533be7338.html
[3] https://attorneygeneral.delaware.gov/wp-content/uploads/sites/50/2025/06/McLean-Mortgage-Corporation-DE-Attachment.pdf

8.    Plaintiffs and Class Members suffered injury from this Data Breach in the form of actual misuse of their compromised data. The actual misuse consists of posting the compromised data to the dark web, using the compromised data to defraud Plaintiffs, the unauthorized opening of accounts, and a noticeable increase in spam texts and phone calls after the Data Breach that Plaintiffs attribute to the Data Breach.

9.    Considering Plaintiffs' and Class Members' Private Information was stolen, was subsequently posted to the dark web, and has already been misused, they now face a lifetime risk of identity theft due to the nature of the information lost, which they cannot change, and which cannot be made private again.

10.    The theft of their PII in the Data Breach has injured Plaintiffs and Class Members in multiple ways, including: (i) the lost or diminished value of their Private Information; (ii) costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and other unauthorized use of their data; (iii) lost opportunity costs to mitigate the Data Breach's consequences, including lost time; (iv) lost benefit of the bargain; and (v) emotional distress associated with the loss of control over their highly sensitive PII.

11.    Defendant's failure to protect the PII stolen in the Data Breach has harmed and will continue to harm Plaintiffs and Class Members.

12.    On behalf of themselves and the Class defined below, Plaintiffs bring causes of action against Defendant for negligence, breach of implied contract, unjust enrichment, and declaratory judgement seeking damages and injunctive relief, including improvements to Defendant's data security systems and integrated services, future annual audits, and adequate credit monitoring.

## THE PARTIES

13.    Plaintiff Jayaprakash Radhakrishnan is, and at all relevant times has been, a resident and citizen of the State of Maryland where he intends to remain.

14.    Plaintiff Micah Parks is, and at all relevant times has been, a resident and citizen of the State of Virginia where he intends to remain.

15.    Plaintiff Priscilla Millberry is, and at all relevant times has been, a resident and citizen of the State of Maryland where she intends to remain.

16.    Defendant McLean Mortgage Corporation is a Virginia corporation, with its principal place of business located at 11325 Ransom Hills Road, Suite 400, Fairfax, Virginia.

## JURISDICTION AND VENUE

17.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is over 100, and at least one Class member is a citizen of a state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

18.    This Court has personal jurisdiction over Defendant because Defendant conducts business in this District, Defendant McLean maintains a principal place of business in this District, and Defendant has sufficient minimum contacts with this State.

19.    Further, venue is proper under 28 U.S.C. § 1391(b) because Defendant is headquartered within this District and a substantial part of the events or omissions giving rise to this claim occurred within this District.

## FACTUAL ALLEGATIONS

**Defendant's Business**

20.     Defendant is a financial services provider specializing in mortgages and other financing solutions for residential properties.

21.     Plaintiffs and Class Members are consumers and/or former employees who provided their Private Information to McLean in exchange for financial services or employment opportunities.

22.     The information held by Defendant at the time of the Data Breach included the unencrypted Private Information of Plaintiffs and Class Members.

23.     Upon information and belief, Defendant made representations, including to its customers, employees, and potential customers, that the Private Information it collected would be kept safe and confidential, the privacy of that information would be maintained, and Defendant would delete any sensitive information after it was no longer required to maintain it.

24.     Indeed, McLean maintains a publicly facing website outlining its Privacy Policy to potential consumers, which includes assurances that McLean "has certain measures in place to maintain the security, confidentiality and integrity of the information gathered through the Website, and to help protect against the loss, misuse and alteration of such information."[4]

25.     As evidenced by the fact that unauthorized threat actors were able to access and *exfiltrate* information from Defendant's network during the Data Breach, these representations were false and misleading.

---

[4] *See* McLean Mortgage Consumer Privacy Notice – available at:
https://mcleanmortgage.mymortgage-online.com/PrivacyPolicy.html

26.     Plaintiffs' and Class Members' Private Information was provided to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with their obligations to keep such information confidential and secure from unauthorized access.

27.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiffs and Class Members relied on the sophistication of Defendant to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

28.     Defendant had a duty to adopt reasonable measures to protect the Private Information of Plaintiffs and Class Members from involuntary disclosure to third parties. Defendant had a legal duty to keep Plaintiffs' and Class Members' Private Information safe and confidential.

29.     Defendant had obligations under the FTC Act, the Gramm-Leach-Bliley Act, contract, industry standards, and express representations made to Plaintiffs and Class Members within their Privacy Policy, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

30.     Indeed, these obligations are acknowledged by Defendant as they state within their Privacy Policy that they provide a "Consumer Privacy Notice" to each individual customer. The link to the Consumer Privacy Notice on Defendant's website redirects to the FTC's Privacy and Security guide for businesses.[56]

---

[5] *See Id.*
[6] *See* https://www.ftc.gov/business-guidance/privacy-security

31.     Defendant derived a substantial economic benefit from collecting Plaintiffs' and Class Members' Private Information. Without the required submission of Private Information, Defendant could not perform the services it provides.

32.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

**The Data Breach and Defendant's Belated Notice**

33.     On or about June 11, 2025, Defendant began notifying victims of the Data Breach, informing them by Notice of Data Event ("Notice"):

> On October 17, 2024, McLean identified suspicious activity within its digital systems. Upon learning of this activity, McLean immediately took steps to secure the network and engaged digital forensics specialists to investigate what happened and help determine whether any sensitive information may have been impacted. Based on that investigation, McLean learned that an unauthorized actor gained access to its network and may have ***downloaded*** certain files. Following this confirmation, McLean conducted a comprehensive review of the potentially affected data and determined that personal information belonging to certain individuals may have been accessed in connection with this incident. This review was completed on May 12, 2025. McLean then worked diligently to effectuate notification to potentially affected individuals.[7]

34.     Upon review of the information stolen in the Breach, McLean determined that the information accessed and potentially downloaded included the full names, Social Security numbers, driver's license numbers, and financial account numbers of the Plaintiffs and Class Members.[8]

---

[7] *See*: https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/e423ab1f-c575-44f8-b5fc-c02533be7338.html (emphasis added).
[8] *Id.*

35.     The notorious ransomware group Black Basta publicly claimed credit for the Data Breach and posted files stolen in the Data Breach to the dark web following Defendant's apparent refusal to meet a ransom demand for the return of the information.[9] Public reporting suggests that up to a terabyte of information stored in Defendant's inadequately secured computer systems may have been taken by cybercriminals during the Data Breach.[10] To prove its claims, Black Basta posted a sample of the files stolen from McLean to its data leak website:[11]



36.     According to publicly available reports maintained by the United States Cybersecurity and Infrastructure Security Agency, Black Basta is a "ransomware variant whose

---

[9] *See* https://www.comparitech.com/news/mclean-mortgage-notifies-30k-people-of-data-breach-that-compromised-ssns-financial-accounts/

[10] https://cy-napea.com/when-trust-crumbles-the-mclean-mortgage-data-breach-that-shook-thousands

[11] https://www.comparitech.com/news/mclean-mortgage-notifies-30k-people-of-data-breach-that-compromised-ssns-financial-accounts/

actors have encrypted and stolen data from at least 12 out of 16 critical infrastructure sectors, including the Healthcare and Public Health (HPH) Sector."[12]

37.     Black Basta and their affiliates "use common initial access techniques—such as phishing and exploiting known vulnerabilities—and then employ a double-extortion model, both encrypting systems and exfiltrating data." Using these tactics, Black Basta has executed successful attacks on 500 organizations globally.[13]

38.     Evidenced by the Data Breach, Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of Private Information.

39.     McLean was a soft target for cyber thieves who recognized that as a financial services company it collects, maintains, and even creates PII. Through the cyber-attack, unauthorized cybercriminals **"*downloaded*"** certain files maintained by Defendant.[14] The stolen documents included, *inter alia*, the Private Information of Plaintiffs and Class Members.

40.     Thus, as a result of Defendant's security failures, a malicious threat actor accessed and acquired files in Defendant's computer systems containing unencrypted Private Information of Plaintiffs and Class Members, including names and Social Security numbers which are nearly impossible for the victims of the Breach to change.

41.     Despite the sensitivity of the PII that was exposed and taken by the threat actor, and the attendant consequences to affected individuals as a result of the exposure, Defendant failed to

---

[12] *See:* https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-131a
[13] *Id.*
[14] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/e423ab1f-c575-44f8-b5fc-c02533be7338.html

disclose the Data Breach for ***almost nine months*** after the Data Breach. This inexplicable delay further exacerbated the harms to Plaintiffs and Class Members.

42.     Based on the notice letter received by Plaintiffs, the type of cyberattack involved, and public news reports, it is plausible and likely that Plaintiffs' Private Information was stolen in the Data Breach.

43.     Upon information and belief (and according to public reports linking Black Basta to the Breach), Plaintiffs' and Class Members' Private Information was subsequently published and sold on the dark web, as that is the *modus operandi* of cybercriminals affecting these types of attacks.

44.     Defendant had obligations created by industry standards, common law, statutory law, and their own assurances and representations to keep Plaintiffs' and Class Members' Private Information confidential and to protect such Private Information from unauthorized access.

45.     Nevertheless, Defendant failed to spend sufficient resources on encrypting sensitive personal data, preventing external access, detecting outside infiltration, and training its employees to identify hacking threats and defend against them.

46.     The stolen Private Information at issue has great value to the hackers, due to the large number of individuals affected and the fact that sensitive information such as Plaintiffs' Social Security Numbers, was part of the data that was compromised.

47.     Given the type of targeted attack in this case, the type of Private Information accessed, and the fact that such information was successfully exfiltrated by cybercriminals and subsequently offered for sale by Black Basta, Plaintiffs' and Class Members' Private Information has been placed on the black market/dark web for sale and purchase by criminals intending to

utilize such information for identity theft crimes. In fact, Plaintiffs' Private Information has already been misused in multiple instances and posted on the dark web since the Data Breach.

48.     Defendant was negligent and did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiffs and Class Members, causing the exposure of Private Information for Plaintiffs and Class Members.

49.     For example, as evidenced by the Data Breach's occurrence, the infiltrated network was not protected by sufficient multi-layer data security technologies or effective firewalls.

50.     Similarly, based on the delayed discovery of the Data Breach, it is evident that the infiltrated network that Defendant allowed to store Plaintiffs' Private Information did not have sufficiently effective endpoint detection.

51.     Further, the fact that PII was stolen in the Data Breach demonstrates that the Private Information contained in the Defendant's network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

52.     Plaintiffs and Class Members entrusted Defendant with their PII, which includes information (such as Social Security numbers) that are static, do not change, and can be used to commit a myriad of financial crimes.

53.     Even with several months of credit monitoring services, unauthorized misuse of Plaintiffs' and Class Members' Private Information has already occurred and the threat of further misuse of this information remans ongoing and will for years to come. Additional instances of fraudulent activity resulting from the Data Breach may not come to light for years.

54.     Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiffs' and the Class's Private

Information. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiffs' and the Class's financial accounts.

55.    Because Defendant had a duty to protect Plaintiffs' and Class Members' Private Information that it collected, Defendant should have known through readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information.

56.    Defendant breached its obligations to Plaintiffs and Class Members and was otherwise negligent and/or reckless because it failed to properly maintain and safeguard its computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.    Failing to properly monitor their data security systems for existing intrusions;

c.    Failing to ensure vendors with access to their computer systems and data employed reasonable security procedures;

d.    Failing to train their employees in the proper handling of emails containing Private Information and maintaining adequate email security practices;

e.    Failing to ensure the confidentiality and integrity of electronic Private Information it created, received, maintained, and/or transmitted;

f.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic Private Information to allow access only to those persons or software programs that have been granted access rights;

g.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations;

h.  Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports;

i.  Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic Private Information;

j.  Failing to protect against reasonably anticipated uses or disclosures of electronic Private Information that are not permitted under the privacy rules;

k.  Failing to train all members of their workforces effectively on the policies and procedures regarding Private Information as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of Private Information;

l.  Failing to render the electronic Private Information they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as they had not encrypted the electronic Private Information;

m.  Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

n.  Failing to adhere to industry standards for cybersecurity; and

o.  Otherwise breaching their duties and obligations to protect Plaintiffs' and Class Members' Private Information.

57.    Defendant negligently and/or recklessly failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access Defendant's computer network and systems which contained unsecured and unencrypted Private Information.

58.     Accordingly, Plaintiffs and Class Members have suffered actual misuse of their data and  now face a continuing increased risk of fraud and identity theft. In addition, Plaintiffs and the Class Members also lost the benefit of the bargain they made with Defendant.

**Defendant Acquired, Collected, and Stored Plaintiffs' and Class Members' Private Information**

59.     As a condition of receiving Defendant's services, Plaintiffs and Class Members were required to give their sensitive and confidential Private Information to Defendant.

60.     Defendant retains and stores this information and derives a substantial economic benefit from the Private Information that they collect. But for the collection of Plaintiffs' and Class Members' Private Information, Defendant would be unable to perform their services.

61.     By obtaining, collecting, and storing the Private Information of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Private Information from disclosure.

62.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendant to keep their Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

63.     Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiffs and Class Members.

64.     Upon information and belief, Defendant made promises and representation to their customers and employees to maintain and protect the Private Information of Plaintiffs and Class Members, demonstrating an understanding of the importance of securing Private Information.

Plaintiffs and Class Members would not have provided their Private Information absent these representations.

65.    Defendant's negligence in safeguarding the Private Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

### Defendant Knew or Should Have Known of the Risk of a Cyber Attack Because Entities in Possession of Private Information Are Particularly Suspectable to Cyber Attacks

66.    Data thieves regularly target entities in the financial services industry like Defendant due to the highly sensitive information that they maintain. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

67.    Defendant's data security obligation was particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities like Defendant that collect and store Private Information and other sensitive information, preceding the date of the Data Breach.

68.    In light of recent high profile data breaches at other industry-leading companies, including, *e.g.*, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

69.    In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks because

warnings were readily available and accessible via the internet. Indeed, the United States government posted a detailed cybersecurity advisory on May 10, 2024, detailing the methodologies employed by the very group which took credit for the Data Breach.[15]

70.    The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[16]

71.    Further, in 2022, the Identity Theft Resource Center's Annual End-of-Year Data Breach Report listed 1,802 total compromises involving 422,143,312 victims for 2022, which was just 50 compromises short of the current record set in 2021.[17]

72.    In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[18]

73.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary

---

[15] *See* https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-131a
[16] *2022 End of Year Data Breach Report*, Identity Theft Resource Center (Jan. 25, 2023), available at: https://www.idtheftcenter.org/publication/2022-data-breach report/?utm_source=press+release&utm_medium=web&utm_campaign=2022+Data+Breach+R eport.
[17] *Id*.
[18] ZDNet, Ransomware mentioned in 1,000+ SEC filings over the past year (Apr. 30, 2020) (emphasis added), available at https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

forms of extortion."[19]

74.    This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that: (i) cybercriminals were targeting financial companies such as Defendant, (ii) cybercriminals were ferociously aggressive in their pursuit of companies in possession of significant sensitive information such as Defendant, (iii) cybercriminals were leaking corporate information on dark web portals, and (iv) cybercriminals' tactics included threatening to release stolen data. Further, based on the contemporaneous notice posted by the United States government in the leadup to the Breach, Defendant should have been aware of the threat posed by Black Basta and the likely ways they would seek to exploit Defendant's systems.

75.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

76.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to tens of thousands of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

77.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

_____

[19] U.S. CISA, Ransomware Guide – September 2020, available at https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf.

78.     The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

79.     As an entity in possession of Plaintiffs' and Class Members' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class Members because of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

**The Data Breach was Preventable**

80.     By obtaining, collecting, and storing the Private Information of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Private Information from disclosure.

81.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[20]

82.     To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and

---

[20] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[21]

---

[21] *Id.* at 3-4.

83.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- Update and patch your computer. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks. . . .

- Use caution with links and when entering website addresses. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net). . . .

- Open email attachments with caution. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- Keep your Private Information safe. Check a website's security to ensure the information you submit is encrypted before you provide it. . . .

- Verify email senders. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- Inform yourself. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- Use and maintain preventative software programs. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic. . . .[22]

---

[22] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://www.cisa.gov/news-events/news/protecting-against-ransomware.

84. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

Secure internet-facing assets
- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; Remove privilege credentials

Thoroughly investigate and remediate alerts
- Prioritize and treat commodity malware infections as potential full comprise

Include IT Pros in security discussions
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely

Build credential hygiene
- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords
- Apply principle of least-privilege

Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event logs
- Analyze logon events

Harden infrastructure
- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[23]

85. Given that Defendant was storing the Private Information of other individuals, Defendant could and should have implemented all of the above measures to prevent and detect ransomware attacks.

---

[23] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

86.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the Private Information of Plaintiffs and Class Members.

87.    Defendant could have prevented this Data Breach by properly securing and encrypting the folders, files, and or data fields containing the Private Information of Plaintiffs and Class Members. Alternatively, Defendant could have destroyed the data it no longer had a reasonable need to maintain or only stored data in an internet-accessible environment when there was a reasonable need to do so.

88.    Defendant's negligence in safeguarding the Private Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

89.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

90.    Defendant disregarded the rights of Plaintiffs and Class Members by recklessly and/or negligently failing to take and implement adequate and reasonable measures to ensure that the Private Information of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, Plaintiffs' and Class Members' Private Information was compromised through disclosure to an unknown and unauthorized criminal third party.

91.    Upon information and belief, Defendant breached its duties and obligations in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable

network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiffs and Class Members of Defendant's inadequate data security practices; (6) failing to encrypt or adequately encrypt the Private Information; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack; and (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

92.    The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class Members are long-lasting and severe. Once Private Information is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

### Cyber Criminals Will Continue to Use Plaintiffs' and Class Members' Private Information to Defraud Them or to Sell on the Dark Web

93.    Plaintiffs and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and the Class Members and to profit off their misfortune.

94.    Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[24] For example, with the Private Information stolen in the Data Breach, identity

---

[24] "Facts + Statistics: Identity Theft and Cybercrime," Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

thieves can open financial accounts, apply for credit, collect government benefits, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[25] These criminal activities have resulted and will result in devastating financial and personal losses to Plaintiffs and Class Members.

95.    Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.[26]

96.    This was a financially motivated Data Breach, as apparent from the discovery of the cyber criminals seeking to profit from the sale of Plaintiffs' and the Class Members' Private Information on the dark web. The Private Information exposed in this Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein.

97.    These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to personally identifiable information, they will use it.[27]

98.    Hackers may not use the accessed information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily

---

[25] https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/.

[26] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/products/gao-07-737.

[27] Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

rule out all future harm.[28]

99.    As described above, identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit.[29]

100.    With this Data Breach, identity thieves have already started to prey on the victims, including Plaintiffs, and one can reasonably anticipate this will continue.

101.    The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Private Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[30] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[31] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[32]

102.    Based on the foregoing, the Private Information stolen in the Data Breach, which includes Social Security numbers, is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

---

[28] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/products/gao-07-737.
[29] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.
[30] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.
[31] *Here's How Much Your Private Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.
[32] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

103.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

104.    One such example of criminals using Private Information for profit is the development of "Fullz" packages.[33]

105.    Cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

106.    The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

---

[33] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texaslife-insurance-](https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-undergroundstolen-from-texas-life-insurance-finn/

107.    That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and the Class's stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

108.    Victims of the Data Breach, like Plaintiffs and other Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their credit because of the Data Breach.[34]

109.    In fact, as a direct and proximate result of the Data Breach, Plaintiffs and the Class have already suffered from multiple instances of identity theft using their Private Information. Further, they have also been placed at a continued increased risk of suffering further harm from fraud and identity theft as their data will forever be available to malign actors who will seek to misuse it. Plaintiffs and the Class must now take the time and effort and spend the money to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and other personal accounts for unauthorized activity for years to come.

110.    Plaintiffs and the Class have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including:

a.    Trespass, damage to, and theft of their personal property, including Private Information;

---

[34] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

b.     Improper disclosure of their Private Information;

c.     The actual and imminent injury flowing from fraud and identity theft posed by their Private Information being placed in the hands of criminals and having been already misused;

d.     The actual and imminent risk of having their Private Information used against them by spam callers to defraud them;

e.     Damages flowing from Defendant's untimely and inadequate notification of the Data Breach;

f.     Loss of privacy suffered as a result of the Data Breach;

g.     Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

h.     Ascertainable losses in the form of deprivation of the value of individuals' Private Information for which there is a well-established and quantifiable national and international market;

i.     The loss of use of and access to their credit, accounts, and/or funds;

j.     Damage to their credit due to fraudulent use of their Private Information; and

k.     Increased cost of borrowing, insurance, deposits and other items which are adversely affected by a reduced credit score.

111.     Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which remains in the possession of Defendant, is protected from further breaches by the implementation of industry standard and statutorily compliant security measures and safeguards. Defendant has shown itself to be incapable of protecting Plaintiffs' and Class Members' Private Information.

28

112.     Plaintiffs and Class Members are trying to mitigate the damage that Defendant has caused them but, given the Private Information Defendant made accessible to hackers, they are certain to incur additional damages. Because identity thieves have their Private Information, Plaintiffs and all Class Members will need to have identity theft monitoring protection for the rest of their lives.

113.     None of this should have happened. The Data Breach was preventable.

**Defendant Could Have Prevented the Data Breach but Failed to Adequately Protect Plaintiffs' and Class Members' Private Information**

114.     Data breaches are preventable.[35] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[36] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[37]

115.     "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[38]

---

[35]Lucy L. Thompson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).
[36]*Id.* at 17.
[37]*Id.* at 28.
[38]*Id.*

### *Defendant Failed to Comply with FTC Guidelines*

116.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

117.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[39] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[40]

118.    In 2016, the FTC updated its publication, Protecting Private Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of Private Information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[41]

119.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone

---

[39] 17 C.F.R. § 248.201 (2013).
[40] *Id.*
[41] *Protecting Private Information: A Guide for Business*, FEDERAL TRADE COMMISSION (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[42]

120.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

121.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

122.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

123.    Defendant failed to properly implement basic data security practices.

124.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information or to comply

---

[42] *Id.*

31

with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

125.    Upon information and belief, Defendant was at all times fully aware of their obligation to protect the Private Information of Plaintiffs and Class Members; Defendant was also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

### *Defendant Owed Plaintiffs and Class Members a Duty Under Industry Standards and Applicable Law to Safeguard their Private Information*

126.    In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, viewed and misused by unauthorized persons. Defendant owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected the Private Information of Class Members.

127.    Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in their possession, including adequately training its employees and others who accessed Private Information within their computer systems on how to adequately protect Private Information.

128.    Several best practices have been identified that at a minimum should be implemented by large financial entities like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-

malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

129.    Other best cybersecurity practices that are considered industry-standard include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

130.    Defendantfailed to meet the minimum standards of any of the following frameworks: NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

131.    These foregoing frameworks exist and applicable industry standards, particularly for large financial entities. Defendant, however, failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

132.    The mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take necessary steps to secure Plaintiffs' and Class Members' Private Information from those risks left that information in a dangerous condition.

133.    Defendant disregarded the rights of Plaintiffs and Class Members by, *inter alia*: (i) recklessly and/or negligently failing to take adequate and reasonable measures to ensure that its business email accounts were protected against unauthorized intrusions; (ii) failing to disclose that

it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiffs' and Class Members' Private Information; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

134.    Defendant owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

135.    Defendant owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

136.    Defendant owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

137.    Defendant owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

**The Data Breach Increases Plaintiffs' and Class Members' Risk of Suffering Additional Instances of Identity Theft**

138.    Upon information and belief, the unencrypted Private Information of Plaintiffs and Class Members has already been misused and made publicly available on the dark web.

139.    Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members.

140.    Simply put, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members because of the Data Breach.

141.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information.

34

Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

142.    Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[43]

143.    Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

144.    Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective patients."[44]

145.    "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a patient's identity

---

[43] *See* N.C. Gen. Stat. § 132-1.10(1)
[44] *See* https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-securitynumbers

after the initial account setup[.]"[45] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account."[46]

146.    Each year, identity theft causes billions of dollars of losses to victims in the United States.[47] For example, with the Private Information stolen in the Data Breach, identity thieves can open financial accounts, apply for credit, collect government benefits, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[48] These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and Class Members.

147.    Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.[49] This stolen Private Information is then routinely traded on dark web black markets as a simple commodity.[50]

148.    This is particularly true, as is the case in the Data Breach here, when cybercriminals

---

[45] *See* https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibituse-of-social-security-numbers/
[46] *See* https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-securitynumber-108597/
[47] *Facts + Statistics: Identity Theft and Cybercrime*, Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime.
[48] John Egan*, What Should I Do if My Driver's License Number is Stolen*, Experian (June 13, 2024), https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/.
[49] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/products/gao-07-737.
[50] Edvardas Mikalauskas, *What is your identity worth on the dark web?* Cybernews (September 28, 2021), https://cybernews.com/security/whats-your-identity-worth-on-dark-web/.

are able to access and obtain an individual's Social Security Number. A compromised Social Security number can give criminals and other unsavory groups the ability to fraudulently take out loans under the victims' name, open new lines of credit, and cause other serious financial difficulties for victims:

> [a] dishonest person who has your Social Security number can use it to get other Private Information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[51]

149.    Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit from their misfortune.

150.    According to data security experts, one out of every four data breach notification recipients become a victim of identity fraud.[52]

151.    Furthermore, the Private Information has a long shelf life because it contains different types of PII, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

152.    There is also a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by

---

[51] United States Social Security Administration, *Identity Theft and Your Social Security Number*, United States Social Security Administration (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[52] *Press Release,* Javelin Strategy & Research (Feb. 20, 2013), https://javelinstrategy.com/press-release/more-12-million-identity-fraud-victims-2012-according-latest-javelin-strategy-research.

cybercriminals presents a concrete risk that the cybercriminals who now possess Class Members' Private Information will do so at a later date or resell it.

**Loss of Time to Mitigate the Risk of Identity Theft and Fraud**

153.    As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

154.    Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

155.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and resecuring their own computer systems.

156.    Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[53]

157.    Plaintiffs' mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended

---

[53] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[54]

158. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

159. Due to the nonfungible nature of the information compromised in this Breach (name and Social Security Number), limited scope credit monitoring of the type offered by the Defendant is a woefully inadequate solution to the imminent and ongoing threat of identity theft faced by Plaintiffs and the Class.

**Diminution of Value of Private Information**

160. Private Information is valuable property.[55] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

161. The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach is difficult,

---

[54] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps.
[55] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

if not impossible, to change.

162.    This kind of data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[56]

163.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[57]

164.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[58] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[59,60]

165.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[61]

166.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and

---

[56] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[57] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[58] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[59] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[60] https://datacoup.com/.

[61] https://digitalpanel.nielsen.com/ui/US/en/sdp/landing?SourceId=698&PID= join%20the,software%20installed%20on%20your%20computer

diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

167.    The fraudulent activity resulting from the Data Breach may not come to light for years.

168.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

169.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to millions of individuals' detailed Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

170.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

**The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary**

171.    Given the type of targeted attack in this case, the sophisticated criminal activity, the volume of data compromised in this Data Breach, the sensitive type of Private Information involved in this Data Breach, and the fact that cybercriminals have already begun to misuse Plaintiffs' Private Information, it is probable that entire batches of stolen information have been placed on the black market/dark web for sale and purchase by criminals intending to utilize the

41

Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

172.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or his Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

173.    Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

174.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear, but for Defendant's failure to safeguard their Private Information.

## PLAINTIFFS' EXPERIENCES

### *Plaintiff Jayaprakash Radhakrishnan*

175.    Plaintiff Radhakrishnan received a notice letter from Defendant dated June 11, 2025, informing him that his Private Information—including his Social Security Number—was specifically identified as having been exposed to cybercriminals in the Data Breach.[62]

---

[62]*See* Defendant's Breach Notice, available at:
https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-
a1252b4f8318/e423ab1f-c575-44f8-b5fc-c02533be7338.html

176.    Plaintiff Radhakrishnan is very careful about sharing his sensitive information. To the best of Plaintiff's knowledge, he has never before had his Private Information exposed in any other data breach.

177.    Plaintiff Radhakrishnan stores any documents containing his Private Information in a safe and secure location. Plaintiff Radhakrishnan has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

178.    Because of the Data Breach, Plaintiff Radhakrishnan's Private Information is now in the hands of cybercriminals.

179.    Plaintiff Radhakrishnan has suffered actual injury from the exposure and theft of his Private Information—which violates his right to privacy.

180.    As a result of the Data Breach, Plaintiff Radhakrishnan has experienced severe data misuse and identity theft. For example, since the Data Breach, in March and April of 2025, unknown individuals used Plaintiff Radhakrishnan's Private Information to engage him in a scam which resulted in him transferring thousands of dollars to the scammers, who then vanished. In conducting the scam, the identity thieves posed as legitimate investment brokers offering an investment opportunity in cryptocurrency. The scammers had extensive knowledge of his Private Information, and he never experienced these types of incidents prior to the Breach. Plaintiff Radhakrishnan also received noticeably more spam calls since the time of the Breach. Plaintiff Radhakrishnan attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity, the fact that he is very careful with his Private Information, and the fact that he has never experienced anything like this prior to now.

181.    As a result of the Data Breach, which exposed highly valuable information such as his Social Security number, Plaintiff Radhakrishnan is now also imminently at risk of crippling future identity theft and fraud.

182.    As a result of the Data Breach, Plaintiff Radhakrishnan has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Radhakrishnan has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, communicating with law enforcement regarding the theft, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

183.    The letter Plaintiff Radhakrishnan received from Defendant specifically directed him to take the actions described above.  Indeed, the Breach Notice that Defendant sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant by reviewing your account statements and credit reports closely."[63] In addition, the breach notice advised victims of the Data Breach to sign up for credit monitoring and informed them how they could place a credit freeze on their file through a credit reporting agency.[64]

184.    As a result of the Data Breach, Plaintiff Radhakrishnan has experienced stress, anxiety, and concern due to the loss of his privacy and concern over the impact of cybercriminals accessing and misusing his Private Information. Plaintiff Radhakrishnan is particularly concerned

---

[63] *Id.*
[64] *Id.*

over losing such a large sum of money and is concerned cybercriminals will be able to use his information to commit further acts of theft against him.

185.    Plaintiff Radhakrishnan anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

186.    Plaintiff Radhakrishnan has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the actual and imminent injury flowing from fraud and identity theft posed by Plaintiff Radhakrishnan's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Radhakrishnan's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Radhakrishnan's Private Information; and (e) continued risk to Plaintiff Radhakrishnan's Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

### *Plaintiff Micah Parks*

187.    Plaintiff Parks received a notice letter from Defendant dated June 11, 2025, informing him that his Private Information—including his Social Security Number—was specifically identified as having been exposed to cybercriminals in the Data Breach.[65]

---

[65] *Id.*

188.    Plaintiff Parks is very careful about sharing his sensitive information. To the best of Plaintiff's knowledge, he has never before had his Private Information exposed in any other data breach.

189.    Plaintiff Parks stores any documents containing his Private Information in a safe and secure location. Plaintiff Parks has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

190.    Because of the Data Breach, Plaintiff Parks's Private Information is now in the hands of cybercriminals.

191.    Plaintiff Parks has suffered actual injury from the exposure and theft of his Private Information—which violates his right to privacy.

192.    As a result of the Data Breach, Plaintiff Parks has experienced severe data misuse and identity theft. For example, since the Data Breach, on September 21, 2025, unknown individuals used Plaintiff Parks' Private Information to fraudulently open two Boost Mobile accounts in his name. Plaintiff Parks has also received noticeably more spam calls since the time of the Breach. Plaintiff Parks attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity, the fact that he is very careful with his Private Information, and the fact that he has never experienced anything like this prior to now.

193.    As a result of the Data Breach, which exposed highly valuable information such as his Social Security number, Plaintiff Parks is now imminently at risk of crippling future identity theft and fraud.

194.    As a result of the Data Breach, Plaintiff Parks has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Parks has already expended time

and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, screening spam calls, communicating with Boost Mobile regarding the fraudulent accounts created in his name, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

195.    The letter Plaintiff Parks received from Defendant specifically directed him to take the actions described above. Indeed, the Breach Notice that Defendant sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant by reviewing your account statements and credit reports closely."[66] In addition, the breach notice advised victims of the Data Breach to sign up for credit monitoring and informed them how they could place a credit freeze on their file through a credit reporting agency.[67]

196.    Plaintiff Parks fears that criminals will use his information to commit further acts of identity theft against him.

197.    As a result of the Data Breach, Plaintiff Radhakrishnan has experienced stress, anxiety, and concern due to the loss of his privacy and concern over the impact of cybercriminals accessing and misusing his Private Information.

198.    Plaintiff Parks anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

199.    Plaintiff Parks has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the actual and imminent

---

[66] *Id.*
[67] *Id.*

injury flowing from fraud and identity theft posed by Plaintiff Parks's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Parks's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and  at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Parks's Private Information; and (e) continued risk to Plaintiff Parks's Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

### *Plaintiff Priscilla Millberry*

200.    Plaintiff Millberry received a notice letter from Defendant dated June 11, 2025, informing her that her Private Information—including her Social Security Number— was specifically identified as having been exposed to cybercriminals in the Data Breach.[68]

201.    Plaintiff Millberry is very careful about sharing her sensitive information. To the best of Plaintiff's knowledge, she has never before had her Private Information exposed in any other data breach.

202.    Plaintiff Millberry stores any documents containing her Private Information in a safe and secure location. Plaintiff Millberry has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

203.    Because of the Data Breach, Plaintiff Millberry's Private Information is now in the hands of cybercriminals.

---

[68] *See Id.*

204.    Plaintiff Millberry has suffered actual injury from the exposure and theft of her Private Information—which violates her right to privacy.

205.    As a result of the Data Breach, Plaintiff Millberry has experienced data misuse and identity theft. For example, in the months since the Data Breach, Plaintiff has received notifications advising her that her Private Information, including Social Security number, has been posted to the dark web. Additionally, in the months since the Data Breach, Plaintiff Millberry has experienced a noticeable increase in the volume of spam text messages and phone calls she receives. Plaintiff Millberry attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity, the fact that she is very careful with her Private Information, and particularly given that the cybercriminals who took credit for the Data Breach publicly boosted about posting stolen PII on the dark web.

206.    As a result of the Data Breach, which exposed highly valuable information such as her Social Security number, Plaintiff Millberry is now imminently at risk of crippling future identity theft and fraud.

207.    As a result of the Data Breach, Plaintiff Millberry has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Millberry has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and other information, screening spam calls, freezing her credit due to her information being located on the dark web, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

208. The letter Plaintiff Millberry received from Defendant specifically directed her to take the actions described above. Indeed, the Breach Notice that Defendant sent to Plaintiff Millberry and all Class Members advised individuals affected by the breach to "remain vigilant by reviewing your account statements and credit reports closely."[69] In addition, the breach notice advised victims of the Data Breach to sign up for credit monitoring and informed them how they could place a credit freeze on their file through a credit reporting agency.[70]

209. As a result of the Data Breach, Plaintiff Millberry has experienced stress and concern due to the loss of her privacy and concern over the impact of cybercriminals accessing and misusing her Private Information. Plaintiff Millberry fears that criminals will use her information to commit identity theft.

210. Plaintiff Millberry anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

211. Plaintiff Millberry has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the actual and imminent injury flowing from fraud and identity theft posed by Plaintiff Millberry's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Millberry's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Millberry's Private Information; and (e) continued risk to Plaintiff Millberry's Private Information,

---

[69] *Id.*
[70] *Id.*

which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

## CLASS ACTION ALLEGATIONS

212.   Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23, on behalf of a Classes defined as:

> **Nationwide Class:** All individuals whose Private Information was accessed and/or acquired by an unauthorized party in the Data Breach, including all who were sent a notice of the Data Breach.

213.   Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

214.   Plaintiffs reserve the right to amend the definition of the Class or add a Class or Subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

215.   **Numerosity:** The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, it is likely that hundreds, if not thousands, of individuals had their Private Information compromised in this Data Breach (as evidenced by the fact that Defendant reported to the Maine

Attorney General that 188 persons in Maine alone were notified of this Data Breach).[71] The Class is apparently identifiable within Defendant's records.

216.    Common questions of law and fact exist as to all Class Members and predominate over any questions affecting solely individual Class Members. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class Members, are the following:

a.    Whether and to what extent Defendant has a duty to protect the Private Information of Plaintiffs and Class Members;

b.    Whether Defendant has respective duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c.    Whether Defendant has respective duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

d.    Whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

e.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

f.    Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

---

[71]*See* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/e423ab1f-c575-44f8-b5fc-c02533be7338.html

g.    Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct; and

h.    Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

217.    **Typicality:** Plaintiffs' claims are typical of those of the other Class Members because Plaintiffs, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

218.    This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

219.    **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

220.    **Superiority:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that millions of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

221.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

222.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

223.    Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

    a.    Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

    b.    Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

    c.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

    d.    Whether Defendant's failure to institute adequate protective security measures amounted to breach of an implied contract;

    e.    Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

    f.    Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

### CAUSES OF ACTION

### COUNT I
**Negligence**
*(On behalf of Plaintiffs and the Class)*

224.    Plaintiffs hereby repeat and reallege paragraphs 1 through 223 of this Complaint and incorporate them by reference herein.

225.    Defendant required Plaintiffs and Class Members to submit non-public Private Information in the ordinary course of providing its financial services, including that of Plaintiffs and Class Members.

226.    Defendant gathered and stored the Private Information of Plaintiffs and Class Members as part of its business of soliciting its services, which solicitations and services affect commerce.

227.    Plaintiffs and Class Members entrusted Defendant with their Private Information with the understanding that Defendant would safeguard their information.

228.    Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information were wrongfully disclosed.

229.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

230.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

231.    Defendant's duty of care to use reasonable security measures arose in connection with the special relationship that existed between Defendant and Plaintiffs and Class Members. That special relationship arose because Plaintiffs and Class Members entrusted Defendant with their confidential Private Information, a necessary part of Defendant's services.

232.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant was bound by industry standards to protect confidential Private Information.

233.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Class.

234.    Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

235.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, (a) failing to adopt, implement, and maintain adequate security measures, data security practices, and adequate computer systems to safeguard Class Members' Private Information; (b) failing to adequately monitor the security of their networks and systems; (c) and (c) allowing unauthorized access to Class Members' Private Information.

236.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly considering Defendant's inadequate security practices.

237.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

238.    Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information were wrongfully disclosed.

239.    In fact, Defendant explicitly recognized this in its Privacy Policy where they made multiple representations to Plaintiffs and Class Members that they would keep the Private Information in their custody secure and protect it from unauthorized access. In making these representations, Defendant acknowledged its duty to Plaintiffs and the Class in this regard.

240.    Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and Class Members, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

241.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

242.    Plaintiffs and Class Members had no ability to protect their Private Information that was in, and likely remains in, Defendant's possession.

243.    Defendant was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

244.    Defendant's duty extended to protecting Plaintiffs and Class Members from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard Private Information.

245.    Defendant has admitted that the Private Information of Plaintiffs and Class Members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

246.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and Class Members, the Private Information of Plaintiffs and Class Members would not have been compromised.

247.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and Class Members and the harm and continuing risk of imminent harm, suffered by Plaintiffs and Class Members. The Private Information of Plaintiffs and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

248.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual misuse of their Private Information causing them financial harm; (ii) invasion of privacy; (iii) lost or diminished value of their Private Information; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to

lost time; (v) loss of benefit of the bargain; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

249.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

250.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer the continued risks of exposure of their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

251.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

252.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Breach of Implied Contract
### *(On behalf of Plaintiffs and the Class)*

253.    Plaintiffs hereby repeat and reallege paragraphs 1 through 223 of this Complaint and incorporate them by reference herein.

254.    The Private Information of Plaintiffs and Class Members was provided and entrusted to Defendant as part of Defendant's regular business practice.

255.    Indeed, Defendant required Plaintiffs and the Class Members to provide their Private Information in exchange for financial services or in exchange for employment opportunities.

256.    In turn, Defendant impliedly promised to reasonably protect Plaintiffs' and Class Members' Private Information through adequate data security measures, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

257.    Based on Defendant's conduct, representations (including those in its Privacy Policy), legal obligations, and acceptance of Plaintiffs' and the Class Members' Private Information, Defendant had an implied duty to safeguard their Private Information through the use of reasonable industry standards.

258.    Defendant materially breached their agreement(s) by failing to safeguard such Private Information, violating industry standards necessarily incorporated in the agreement.

259.    Plaintiffs and Class Members have performed under the relevant agreements, or such performance was waived by the conduct of Defendant.

260.    The covenant of good faith and fair dealing is an element of every contract. All such contracts impose on each party a duty of good faith and fair dealing. The parties must act

with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract along with its form.

261.    Defendant's conduct as alleged herein also violated the implied covenant of good faith and fair dealing inherent in every contract.

262.    The losses and damages Plaintiffs and Class Members sustained as described herein were the direct and proximate result of Defendant's breach of the implied contracts with them, including breach of the implied covenant of good faith and fair dealing.

### COUNT III
**Unjust Enrichment**
***(On behalf of Plaintiffs and the Class)***

263.    Plaintiffs repeat and reallege paragraphs 1 through 223 of this Complaint and incorporate them by reference herein.

264.    This claim is pleaded in the alternative to the breach of implied contract claim.

265.    Plaintiffs and Class Members conferred a benefit upon Defendant. After all, Defendant benefitted from using their Private Information from which Defendant derived payments, profits, and other monetary benefits conferred therefrom.

266.    Defendant appreciated or had knowledge of the benefits, and fees, it received through the receipt of Plaintiffs' and Class Members' Private Information.

267.    Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

268.     Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

269.     Instead of providing a reasonable level of security, or retention policies, which would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

270.     Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' Private Information because Defendant failed to adequately protect their Private Information.

271.     Plaintiffs and Class Members have no adequate remedy at law.

272.     Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

## COUNT IV
### Declaratory Judgment
### (On Behalf of Plaintiffs and the Class)

273.     Plaintiffs repeat and reallege paragraphs 1 through 223 of this Complaint and incorporate them by reference herein.

274.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

275.    In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs allege that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

276.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

> a.    Defendant continues to owe a legal duty to use reasonable data security to secure the data entrusted to them;
>
> b.    Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;
>
> c.    Defendant continues to breach their duties by failing to use reasonable measures to the data entrusted to them; and
>
> d.    Defendant's breaches of its duties continue to cause injuries to Plaintiffs and Class Members.

277.    The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

278.    If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

279.    And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs' and Class Members' injuries.

280.    If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

281.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grants the following:

A.    For an order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class and Sub-Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws.

iii.    requiring Defendant to delete, destroy, and purge the Private Information of Plaintiffs and Class Members unless Defendant can provide to the Court

reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.    requiring Defendant to implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of the Private Information of Plaintiffs and Class Members;

v.    prohibiting Defendant from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures;

ix.    requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.    requiring Defendant to conduct regular database scanning and security checks;

      xiv.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

      xv.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves; and

      xvi.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct an attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment.

D.    For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined by a jury at trial;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: November 24, 2025

Respectfully submitted,

/s/ *Lee A. Floyd*
Lee A. Floyd, VSB #88459
Meredith Harbison, VSB #100780
**BREIT BINIAZAN, PC**
2100 East Cary Street, Suite 310
Richmond, VA 23223
Telephone: (804) 351-9040
Facsimile: (804) 351-9170
Lee@bbtrial.com
meredith@bbtrial.com

David K. Lietz (admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Ave., NW, Suite 440
Washington, DC 20015
Phone: 866.252.0878
dlietz@milberg.com

A. Brooke Murphy (admitted *pro hac vice*)
**MURPHY LAW FIRM**
4116 Will Rogers Pkwy, Suite 700
Oklahoma City, OK 73108
Telephone: (405) 389-4989
abm@murphylegalfirm.com

*Interim Class Counsel Counsel*

William B. Federman (admitted *pro hac vice*)
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone: (405) 235-1560
-and
4131 North Central Expressway, Suite 900
Dallas, Texas 75204
Telephone: (405) 235-1560
wbf@federmanlaw.com
trh@federmanlaw.com

Leigh S. Montgomery*
Texas Bar No. 24052214
lmontgomery@eksm.com
**EKSM, LLP**
4200 Montrose Blvd. Ste 200
Houston, Texas 77006
Phone: (888) 350-3931

*Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served upon all counsel of record for each party in the above-captioned actions sought to be consolidated and Defendant's Counsel via electronic mail on this November 24, 2025.

/s/ *Lee A. Floyd*
Lee A. Floyd